UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Danny Laplume**

      **v.**                                    Case No. 08-cv-476-PB
                                                     Opinion No. 2009 DNH 112

**Michael J. Astrue, Commissioner,**
**US Social Security Administration**

MEMORANDUM AND ORDER

     Danny E. Laplume challenges a decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI") benefits.  Laplume has filed a motion asking the court to vacate the Commissioner's decision.  The Commissioner objects and moves for an order affirming his decision.  Because the administrative law judge ("ALJ") committed legal error and improperly rejected the opinion of Laplume's treating physician without sufficient justification, I grant Laplume's motion.

**I.  FACTUAL BACKGROUND**[1]

**A.  Procedural History**

     Laplume applied for SSI payments on October 14, 2005, claiming disability beginning April 30, 2004, due to

---

[1] Citations to the Administrative Transcript are indicated as "Tr."  The parties have submitted a Joint Statement of Material Facts which, because it is part of the court's record (Doc. No. 10), need not be recounted in full in this Order.

deteriorating disc tissue and dyslexia.[2]  (Tr. at 42, 54-59, 101.)  He had a hearing before the ALJ on October 4, 2007.  (Id. at 310.)  On February 7, 2008, the ALJ issued a decision denying Laplume's claim after determining that he was not disabled because he retained the ability to perform other work that existed in significant numbers in the national economy.  (Id. at 31.)  The Appeals Council denied Laplume's request for review, thus rendering the ALJ's decision final.  (Id. at 8-10.)  Laplume now seeks judicial review of the ALJ's ruling.

**B.    Laplume's Education and Work History**

Laplume dropped out of high school two months after the start of eleventh grade and was enrolled in special education classes.  His past work experience includes work as a castor at a jewelry company, a laborer, and a concrete laborer/finisher.  Laplume was twenty-nine years old at the onset of his alleged disability.

**C.    Medical Evidence Before the Administrative Law Judge**

Dr. Frank A. Graf completed an orthopedic examination of Laplume on December 22, 2005.[3]  Dr. Graf found that Laplume had

---

[2] There is extensive discussion in the record regarding Laplume's dyslexia and adjustment disorder.  Because I vacate the Commissioner's decision on other grounds, I omit any examination of the evidence regarding Laplume's mental impairments.

[3] Prior to this visit, Laplume's record shows an emergency room visit on April 6, 2004 due to back pain, a follow up appointment on April 13, 2004, and a physical therapy visit on April 23, 2004 and on April 28, 2004.  (Tr. at 239-44, 216, 245-46.)  Additionally, an x-ray conducted on December 15, 2005,

some decreased range of motion with pain at the end of each range of motion.  Laplume could perform heel and toe walking and he had no foot drop or muscle atrophy in the lower extremities. Straight leg raising was positive and prone lying examination was positive for pain on manipulative palpation spring test at L3-L4, L4-L5, and L5-S1.  Laplume was diagnosed with absent tendo Achilles reflexes bilaterally, and chronic thoracolumbar pain.[4] Dr. Graf also stated that Laplume's ability to lift, carry, bend, twist, push, pull, and sit were diminished by his diagnosis. (Id. at 139-141.)

Laplume presented to the Wentworth-Douglass Hospital emergency room on June 5, 2006, complaining of back pain.  (Id. at 218-22.)  Straight leg raising was positive and vertebral point tenderness was noted, but his reflexes were normal and he had no apparent motor or sensory deficit.  He was diagnosed with exacerbation of chronic back pain and was prescribed Dilaudid[5] and Flexeril.[6]  Although Laplume left walking with a steady gait, he returned to the emergency room to request crutches.  Two days

---

revealed that Laplume had scattered degenerative lipping and intervertebral disk space narrowing at L5-S1.  (Id. at 138.)

[4] The term "thoracolumbar" refers to the thoracic and lumbar portions of the vertebral column.  Stedman's Medical Dictionary 1594 (27th ed. 2000) (hereinafter Stedman's).

[5] Dilaudid is prescribed for the management of pain. Physician's Desk Reference 420 (62d ed. 2008).

[6] Flexeril is prescribed as an adjunct to rest and physical therapy for relief of muscle spasm.  Physician's Desk Reference 1878 (58th ed. 2004).

later, Laplume was admitted to the emergency room again for low
back pain.  Although lower back tenderness was noted, his
straight leg raising was negative and his reflexes were normal.
After being diagnosed with back pain, Laplume was given a
prescription for Naproxen[7] and was instructed to continue with the
Dilaudid and Flexril. (Joint Statement of Facts, Doc. No. 10, at
6.)

Dr. Graf examined Laplume again on March 8, 2007.  (Tr. at
213.)  Laplume told Dr. Graf that he had low back pain, numbness,
and tingling in both legs and that he could not get comfortable
sitting, standing, or lying down.  Dr. Graf noted restriction of
thoracolumbar ranges of motion and segmental sensitivity at L3-L4
and L4-L5.  (Id.)  He also noted that tendo Achilles reflexes
were absent bilaterally.  While no sensory or motor deficits were
observed, Laplume complained of increased pain on attempts at toe
walking.  (Id.)  After diagnosing Laplume with continued low back
pain and lower extremity pain, Dr. Graf provided Laplume with
prescriptions for Relafen[8] and Darvocet[9].  (Id. at 214.)

Laplume underwent a MRI of his lumbar spine on March 14,

---

[7] Naproxen is prescribed for the relief of the signs and
symptoms of rheumatoid arthritis, osteoarthritis and ankylosing
spondylitis.  Physician's Desk Reference 2726 (62d ed. 2008).

[8] Relafen is prescribed for acute and chronic treatment of
the signs and symptoms of osteoarthritis and rheumatoid
arthritis.  Physician's Desk Reference 1601 (58th ed. 2004).

[9] Darvocet is used for the relief of mild to moderate pain.
Physician's Desk Reference 404 (58th ed. 2004).

2007, which revealed an L4-L5 level disc herniation filling the left lateral recess.  (Id. at 211, 215.)  The scan also indicated a broad based disc protrusion at L5-S1 lateralizing toward the right and slightly displacing the S1 nerve root.  (Id.)  The MRI revealed fluid within the facet joints and facet hypertrophy[10] at L4-L5 and L5-S1 as well as annular tears at L4-L5 and L5-S1. (Id. at 211.)

Dr. Graf wrote a letter to Laplume's attorney dated July 10, 2007, in which he outlined Laplume's medical history and explained his functional restrictions.  (Id. at 248-251.)  Dr. Graf explained that Laplume could heel and toe walk without foot drop or motor change at the ankle pivots, but he stands and walks with a forward list and a list to the right.  (Id. at 249.) Straight leg raising was positive bilaterally, and forward bend and left and right bends were restricted.  (Id.)  The tendo Achilles reflex was absent on the right, though it was present on the left.  (Id. at 250.)  Dr. Graf also noted a pain reaction on manipulative palpation spring test throughout the lumbar spine, greatest at L3-L4, L4-L5, and L5-S1.  (Id.)  Pursuant to his examination and his review of the medical evidence, Dr. Graf determined that Laplume met the equivalent criteria of the Disorders of the Spine enumerated in section 1.04A of the Listing of Impairments ("the Listing") under 20 C.F.R. Part 404, Subpart

---

[10] Hypertrophy is a general increase in bulk of a part or organ.  Stedman's 746.

P, Appendix 1.[11]  (Id. at 251.)  Dr. Graf based his conclusion on
Laplume's herniated nucleus pulposus with chronic compromise of
the spinal nerve root and evidence of chronic nerve root
compression with neuroanatomic distribution of pain and
limitation of motion of the spine.  (Id.)  Dr. Graf also based
his opinion on Laplume's abnormal straight leg raising tests as
well as his abnormal gait, posture, and stance.  (Id.)

    Dr. Graf also completed a medical source statement regarding
Laplume's ability to perform work related activities.  (Id. at
252-59.)  Dr. Graf explained that Laplume could never lift or
carry ten pounds, and he was restricted to forty-five minutes of
sitting, one hour of standing, and thirty minutes of walking in
an eight-hour workday.  (Id. at 252-53.)  He also stated that
Laplume could frequently handle, finger and feel, and could
occasionally reach, but he could never push or pull.  (Id. at
254.)  Dr. Graf asserted that Laplume could never operate foot
controls, climb stairs, balance, stoop, kneel, crouch, or crawl.
(Id. at 254-55.)  He also indicated that Laplume could ambulate
without a wheelchair, walker, cane, or crutches, and he could

_____

    [11] Although Dr. Graf does not explicitly state which
subsection Laplume's impairments meet, he appears to be referring
to section 1.04A, which requires nerve root compression,
characterized by neuro-anatomic distribution of pain, limitation
of motion of the spine, motor loss (atrophy with associated
muscle weakness or muscle weakness) accompanied by sensory or
reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine).  20
C.F.R. Part 404, Subpart P, Appendix 1.  Additionally, both
parties directly refer to this section in their briefs.  (Def.'s
Mot., Doc. No. 9-2, at 7; Pl.'s Mot., Doc. No. 8-2, at 7.)

walk one block at a reasonable pace on rough or uneven surfaces.
Lastly, Dr. Graf believed that the limitations he assessed for
Laplume were first present on April 30, 2004, the alleged onset
date of Laplume's disability. (Id. at 257.)

On September 11, 2007, Laplume presented to the emergency
room at Frisbie Memorial Hospital complaining of back pain. (Id.
at 262.) Upon examination, Laplume was shown to have a decreased
range of motion of the back with tenderness and his straight leg
raising was positive. (Joint Statement of Facts, Doc. No. 10, at
12.) After being diagnosed with back pain, Laplume was
prescribed Flexeril, Percocet,[12] and a Medrol Dose Pak,[13] and was
advised to follow-up with Dr. Graf. (Tr. at 265.)

During his follow-up examination with Dr. Graf on November
20, 2007, Laplume stated that his condition remained the same and
rated his pain at eight on a scale of zero to ten. (Id. at 268.)
Laplume stated that he experienced pain in the low back and
buttocks as well as radiation to both posterior thighs. Laplume
complained of an upset stomach due to Relafen and poor pain
relief with Darvocet. (Id.) Accordingly, Dr. Graf changed

---

[12] Percocet is used to relieve moderate to severe pain.
Physician's Desk Reference 1126 (62d ed. 2008).

[13] A Medrol Dose Pak is prescribed as adjunctive therapy for
rheumatic disorders, including rheumatoid arthritis and
ankylosing spondylitis. Medrol Official FDA Information, Side
Effects and Uses, http://www.drugs.com/pro/medrol.html (last
visited June 9, 2009).

Laplume's medications to Mobic[14] and Ultracet.[15]  (Id. at 268-69.)

On December 10, 2007, Dr. J. Warren Axline, an orthopedic surgeon, answered a series of interrogatories regarding Laplume's back impairment and his functional limitations after reviewing his medical record.  (Id. at 270-74.)  Dr. Axline determined that Laplume had degenerative disc disease with narrowing at L5-S1. (Id. at 270.)  He also indicated that the MRI showed a small disc protrusion at L4-L5 and a small bulge at L5-S1 with protrusion on the right side that nearly contacted the S1 nerve root.  (Id.) Dr. Axline found that Laplume's impairment did not meet or equal any impairment described in the Listing because the documented loss of function did not meet the requirements of section 1.00B.2(b).[16]  (Id.)  Additionally, Dr. Axline determined that the data showed no evidence of a need for crutches, referring to Laplume's request for crutches after his emergency room visit on June 5, 2006.  (Id. at 221, 272.)  Dr. Axline concluded that Laplume could sit for six hours in an eight-hour workday, walk for two hours in an eight-hour workday,[17] and stand for two hours

_____

[14] Mobic is used for the relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physician's Desk Reference 857 (62d ed. 2008).

[15] Ultracet is prescribed for the short-term management of acute pain.  Physician's Desk Reference 2492 (58th ed. 2004).

[16] Section 1.00B.2(b) of the Listing defines the inability to ambulate effectively.  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B.2(b).

[17] The parties stipulate that Dr. Axline determined that Laplume could walk for two hours in an eight-hour workday;

in an eight-hour workday.  (Id. at 273.)  He also determined that
Laplume should not engage in heavy work activity, but that he
could lift and carry up to twenty-five pounds frequently and that
there was no basis for limiting Laplume's ability to push, pull,
reach or handle.  (Id.)

    In a letter dated January 8, 2008, Dr. Graf expressed his
disagreement with Dr. Axline.  (Id. at 275.)  First, Dr. Graf
stated that Dr. Axline did not mention the posterior displacement
of the right S1 nerve root, which he believed was significant in
light of Laplume's absent ankle jerk and positive neurological
findings.  (Id.)  Dr. Graf disputed Dr. Axline's contention that
Laplume did not meet or equal the criteria of section 1.04 of the
Listing and that Laplume did not show any loss of function.
(Id.)  The basis for Dr. Graf's disagreement was the
intervertebral disc space narrowing at L5-S1, the intervertebral
disc herniation, and changes that affected the S1 nerve root on
the right.  (Id.)  Dr. Graf also stated that his disagreement was
based on the medical history he received from the patient, a
review of his medical records, and a physical examination that
revealed multiple positive findings including absent tendo
Achilles reflex in the right leg.  (Id.)  Furthermore, Dr. Graf
stated that crutches were appropriately prescribed given
Laplume's disordered gait and lower extremity pain, which he

_____

however, the record indicates that Dr. Axline found that Laplume
could walk for six hours in an eight-hour workday.  (Tr. at 273.)

suggested could be partially relieved through the use of crutches.  (Id.)

**D.    Hearing Testimony**

On October 4, 2007, Laplume testified that he quit school in the eleventh grade and had been enrolled in special education classes beginning in the first grade.  (Id. at 316.)  He also stated that he stopped working on April 30, 2004, due to his back pain.  (Id.)  Laplume explained that any rotation of his back or bending caused pain and that he experienced pain multiple times during the day despite his medication.  He added that past physical therapy treatment worsened his pain.  (Id. at 320-21, 331.)

When asked about his functional limitations, Laplume answered that he could stand for twenty to thirty minutes provided he leans against a wall or a chair.  (Id. at 322.)  He also reported that he could not take full strides when walking and that he could only walk twenty-five yards on even ground before needing to rest.  (Id. at 322-23.)  He believed that the heaviest weight he could lift would be fifteen pounds.  (Id. at 323.)  He added that he could not bend, stoop, crawl, crouch, or kneel because of his back pain.  (Id. at 324-25.)

**E.    The ALJ's Decision**

On February 7, 2008, the ALJ employed the five-step evaluation process established by the Social Security

Administration to determine whether Laplume was disabled.  (Id. at 21-31.)  At the first step, the ALJ found that Laplume had not engaged in substantial gainful activity since his application date.  (Id. at 23.)  At the second step, he found that Laplume had the severe impairments of a degenerative disc disease at L4-S1 with narrowing at L5-S1, and a small disc protrusion at L4-S1 of the lumbosacral spine.  (Id.)  At the third step, the ALJ determined that Laplume's impairments neither met nor equaled an impairment enumerated in the Listing.  (Id. at 26.)

Before proceeding to steps four and five, the ALJ determined that Laplume had the residual functional capacity ("RFC") to perform the full range of sedentary work and a partial range of light work.  (Id. at 27, 31.)  The ALJ concluded at step four that Laplume could not return to his past relevant work.  (Id. at 30.)  However, at step five the ALJ found that Laplume was not disabled because he could perform other work that exists in the national economy in significant numbers by using Rule 201.25 of the Medical-Vocational Guidelines.  (Id. at 31.)

## II.   <u>STANDARD OF REVIEW</u>

Pursuant to 42 U.S.C. § 405(g), the court is authorized "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Commissioner's

findings must be upheld if they are supported by "substantial evidence." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)). Substantial evidence is that which a "reasonable mind, reviewing the evidence in the record as a whole, could accept . . . as adequate to support [the] conclusion." Ortiz, 955 F.2d at 769 (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). It is the responsibility of the ALJ to determine issues of credibility, to resolve conflicts in the evidence, and to draw inferences from the record evidence. Id. However, the ALJ's findings are not conclusive if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

### III. **ANALYSIS**

Laplume contends that the ALJ erred when he rejected Dr. Graf's opinion that Laplume's impairment equaled an impairment described in the Listing.[18] Because Dr. Graf was a treating physician, his opinion will generally be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§

---

[18] I do not address Laplume's additional argument because I am persuaded by his principal challenge to the ALJ's decision.

404.1527(d), 416.927(d).  When a treating physician's opinion is
not given controlling weight, it is "still entitled to deference
and must be weighed using all of the factors provided in 20
C.F.R. § 404.1527 and § 416.927."  Social Security Ruling 96-2P,
Policy Interpretation Ruling Titles II and XVI: Giving
Controlling Weight to Treating Source Medical Opinions, 1996 WL
374188 (S.S.A. 1996) ("SSR 96-2P").  These factors include the
length of the treatment relationship, the frequency and extent of
examination, the explanation provided by the medical source, and
the consistency of the opinion with the record as a whole.  20
C.F.R. §§ 404.1527(d), 416.927(d).  The weight given to non-
treating sources will depend on the extent to which they provide
explanations supporting their opinions.  § 404.1527(d)(3).  The
ALJ's decision must contain specific reasons for the weight given
to the treating source's medical judgment that are supported by
the evidence in the record.  §§ 404.1527(d)(2), 416.927(d)(2)
("We will always give good reasons in our notice of determination
or decision for the weight we give your treating source's
opinion."); SSR 96-2P.

Laplume first argues that the ALJ erroneously rejected Dr.
Graf's assessment because the ALJ mistakenly believed
"significant" nerve root compromise was a requirement of the
Listing and Dr. Graf only noted "chronic" compromise.  The
government concedes, as it must, that section 1.04A of the
Listing does not specify how significant the nerve root

-13-

compromise must be to satisfy section 1.04A.  See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04A; Def.'s Mot., Doc. No. 9-2, at 5.  Thus, the ALJ's rejection of Dr. Graf's opinion because he noted only chronic compromise is a legal error.  This error alone is sufficient to warrant the relief that Laplume seeks.  See Nguyen, 172 F.3d at 35; Belanger v. Barnhart, 2002 WL 1332539, at *6 (D.N.H. June 11, 2002) (remanding because the ALJ failed to adequately explain the basis of his decision to discount the opinions of claimant's health care providers).

Laplume next challenges the ALJ's reliance on Dr. Axline's opinion because his conclusion that Laplume failed to meet or equal any impairment in the Listing is not sufficiently supported.  Dr. Axline's sole justification for his opinion was that Laplume "did not meet the requirements of 1.00B.2(b)," Tr. at 270, which refers to the Listing's definition of "the inability to ambulate effectively," 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B.2(b).  Laplume correctly notes that the inability to ambulate effectively is not a requirement of section 1.04A.  20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04A.  The government interprets Dr. Axline's response to mean that he compared Laplume's medical records to all three spine disorders in the Listing, even though only one of them requires an inability to ambulate.  It is equally possible, however, that Dr. Axline misunderstood the legal guidelines for evaluating Laplume's impairments, believing that the inability to ambulate

was required by all sections of the Listing.  Absent further explanation, Dr. Axline's statement provides no insight into his reasoning.  Accordingly, the ALJ could not properly rely on Dr. Axline's opinions in rejecting Dr. Graf's assessment.  <u>See</u> <u>Nguyen</u>, 172 F.3d at 35.

Finally, Laplume argues that the ALJ did not adequately consider the factors under 20 C.F.R. § 404.1527 and § 416.927 when he gave controlling weight to Dr. Axline's medical assessment rather than Dr. Graf's opinion at step three.[19]  I agree.  Dr. Axline's opinion merits less weight than Dr. Graf's assessment because he is a non-treating source and only provided a cursory and possibly erroneous explanation supporting his belief that Laplume failed to meet or equal any impairment in the Listing.

In contrast, Dr. Graf physically examined Laplume twice over the course of two years before his letter to Laplume's attorney and once more prior to challenging Dr. Axline's opinion.  <u>See</u> 20

---

[19] When determining Laplume's RFC at step four, the ALJ provided a more detailed explanation for adopting Dr. Axline's opinion concerning Laplume's functional capabilities instead of Dr. Graf's assessment.  Tr. at 29-30.  His stated reasons included his finding that Dr. Graf's opinion regarding Laplume's RFC was not supported by his notes from office visits, that Laplume's complaints of pain were not entirely credible, that Dr. Axline's assessment comported more with Laplume's reported activities of daily living, and that Dr. Axline was impartial whereas Dr. Graf was commissioned by Laplume.  (<u>Id.</u>) Nonetheless, these statements have no bearing on the ALJ's failure at step three to specifically explain why he discredited Dr. Graf's statement that Laplume's impairments met the equivalent criteria of section 1.04A.

C.F.R. § 404.1527(d)(2)(I) ("When the treating source has seen
you a number of times and long enough to have obtained a
longitudinal picture of your impairment, we will give the
source's opinion more weight than we would give it if it were
from a nontreating source.").  Unlike Dr. Axline, Dr. Graf
provided detailed explanations supporting his belief that Laplume
met the equivalent criteria of section 1.04A of the Listing.  See
20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source
provides for an opinion, the more weight we will give that
opinion.").

The ALJ did not adequately explain why he gave Dr. Graf's
opinion less weight.  See SSR 96-2P.  Other than his erroneous
statement about the requirement of "significant" nerve root
compromise, the ALJ only adopted Dr. Axline's opinion because it
"more comports with the medical evidence" and "[n]othing in the
record contradicts [Axline's] assessment."  (Tr. at 27.)  Absent
a specific explanation for dismissing Dr. Graf's opinions that
explicitly references supporting evidence, I cannot determine
whether the ALJ based his decision on substantial evidence.  See
Laskey v. Astrue, 2009 WL 232549, at *5 (D. Me Jan. 29, 2009),
aff'd 2009 WL 536892 (D. Me Mar. 3, 2009) (stating that the bare
assertion that a treating source is "unsupported by the clinical
findings" does not qualify as a "good" reason).  On remand, the
ALJ must properly assess the medical source opinions in

accordance with 20 C.F.R. § 404.1527 and § 416.927.[20]  Evans v. Barnhart, 2003 WL 22871698, at *6 (D.N.H. Dec. 4, 2003) (upholding ALJ's rejection of a nurse's opinion because he explicitly weighed the evidence and therefore completely fulfilled his obligation under 20 C.F.R. § 404.1527).

## IV.  CONCLUSION

For the foregoing reasons, I vacate the Commissioner's decision and remand this case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  Laplume's motion to reverse is granted.  (Doc. No. 8).  The Commissioner's motion to affirm is denied.  (Doc. No. 9).  The clerk is directed to enter judgment accordingly.

---

[20] The government offers *post hoc* rationalizations for the ALJ's decision, arguing that Laplume showed no motor loss with reflex loss or positive straight-leg raising for a duration of twelve months.  However, I cannot uphold the ALJ's decision based on rationales unarticulated in the record.  See, e.g., Cagle v. Astrue, 2008 WL 506289, at *5 (10th Cir. Feb. 25, 2008) (rejecting Commissioner's *post hoc* argument concerning the ALJ's finding based on inferences drawn from evidence the ALJ barely referenced in his decision); Laskey, 2009 WL 232549 at *5 n.3 ("[The ALJ's] decision cannot be salvaged by reliance on rationales unarticulated therein.").  Additionally, the government's argument is unpersuasive, as it still fails to address Dr. Graf's detailed reasons supporting his opinion that Laplume met the equivalent criteria of section 1.04A.  See 20 C.F.R. § 416.926(c).  Furthermore, the government ignores Dr. Graf's opinion that Laplume's impairment "is expected" to last twelve months, which meets the duration requirement of 20 C.F.R. § 416.909.  (Tr. at 251.)

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

July 24, 2009

cc:  Raymond Kelly, Esq.
     T. David Plourde, Esq.